b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| CATHY L. JEANSONNE, Appellant | CIVIL DOCKET NO. 1:18-CV-01121 |
| VERSUS | |
| UNITED STATES COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, Appellee | MAGISTRATE JUDGE PEREZ-MONTES |

## MEMORANDUM ORDER

Before the Court is Appellant Cathy L. Jeansonne's ("Jeansonne's) appeal of the denial of her claim for social security disability insurance benefits ("DIB"). Because substantial evidence supports the Commissioner's finding that Jeansonne can work, Jeansonne's appeal is DENIED.

I. Background.

A. Procedural Background.

Jeansonne filed a claim for DIB alleging a disability onset date of February 15, 2015 (ECF No. 13-1 at 150) due to stage 2 breast cancer ("ECF No. 13-1 at 175). That claim was denied by the Social Security Administration ("SSA"). ECF No. 13-1 at 87.

A *de novo* hearing was held before an Administrative Law Judge ("ALJ") at which Jeansonne appeared with her attorney and a vocational expert ("VE"). ECF No. 13-1 at 18. The ALJ found that, although Jeansonne had stage II breast cancer with post-bilateral mastectomy surgery (ECF No. 13-1 at 20), she has the residual functional capacity to perform sedentary work except that she can only occasionally

kneel, stoop, crouch, and crawl (ECF No. 13-1 at 23).  The ALJ further found that, although Jeansonne cannot perform her past relevant work, she has transferrable work skills and can work as a calculator operator, tax preparer, or insurance clerk.  ECF No. 13-1 at 27.  The ALJ concluded that Jeansonne had not been under a disability at any time from February 15, 2015 through the date of her decision on July 21, 2017.  ECF NO. 13-1 at 28.

Jeansonne requested a review of the ALJ's decision, but the Appeals Council declined to review it, and the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").  ECF No. 13-1 at 4.

Jeansonne next filed this appeal requesting judicial review of the Commissioner's final decision.  The sole issue raised by Jeansonne for review on appeal is whether the ALJ erred in finding Jeansonne's mental impairments are non-severe and cause no mental limitations in Jeansonne's ability to work.

    B.    <u>Factual Background</u>

        1.    <u>Medical Records.</u>

Jeansonne, then 53 years old, underwent a bilateral mastectomy in February 2014 due to Stage II-A carcinoma of the right breast.  ECF No. 13-1 at 312, 419.

In July 2014, Dr. Catherine Baucom, an oncologist, recommended an anti-hormone (Tamoxifen) for Jeansonne, but prescribed Arimidex instead because Jeansonne was a smoker.  ECF No. 13-1 at 420.  In October 2014, Dr. Baucom prescribed Effexor to help Jeansonne stop smoking.  ECF 13-1 at 420.  In August 2015, Jeansonne complained of bone pain due to the Arimidex, but she continued to

smoke. ECF No. 13-1 at 420. Jeansonne was prescribed Lortab hydro-codeine, which Jeansonne said worked better than Mobic. ECF No. 13-1 at 420.

In February 2016, Dr. Baucom prescribed Arimidex, Lortab, and Mobic, to prevent the cancer from recurring and for pain. ECF No. 13-1 at 419. Arimidex caused joint pain. ECF No. 13-1 at 419. In August 2016, Jeansonne reported severe bone and joint pain, but Dr. Baucom told she needed to stay on the Arimidex for at least another 3 years. ECF No. 13-1 AT 419. Jeansonne's Lortab was refilled again in October 2016, and she was told if her pain did not improve, she would need to go to a pain management doctor. ECF No. 13-1 at 419.

In February 2016, Jeansonne underwent a disability examination with Dr. Connie Olson. ECF No. 13-1 at 378. Dr. Olson noted Jeansonne's complaints of joint and muscle pain, anxiety, and numbness in her hands. ECF No. 13-1 at 378. Jeansonne reported the joint and muscle pain were caused by her cancer medication, she had those symptoms since 2015, and she had been prescribed and currently took hydrocodone-apap 5-325 for it. ECF No. 13-1 at 378. Jeansonne has also had anxiety since 2014 caused by her physical condition, and had been prescribed and took Xanax. ECF No. 13-1 at 378. Jeansonne reported numbness in her hands since 2015, of unknown cause, for which she has not sought treatment. ECF No. 13-1 at 378. Jeansonne said that shaking her hands down helps relieve the pain. ECF No. 13-1 at 378. Jeansonne admitted she has smoked one pack of cigarette per day for the last 30 years. ECF No. 13-1 at 380. Jeansonne reported daily joint and muscle pain, pain in her toes, and numbness in her hands. ECF No. 13-1 at 380. Jeansonne had normal

muscle strength, good hand-eye coordination, and normal sensory and reflex exams. ECF No. 13-1 at 382-83. Jeansonne had: left knee pain and grinding on exam; a decreased range of motion and pain in the lumbar spine, at times with shooting pain in the left leg; bilateral hand pain in the thumbs and a burning numbness that came and went in the rest of the hand; anxiety; and COPD. ECF No. 13-1 at 384-85. Dr. Olson concluded that Jeansonne has been on medication for breast cancer that has given her side effects of extreme joint pain. ECF No. 13-1 at 385. Jeansonne also has hot flashes and mood swings connected with menopausal symptoms from the medication. ECF No. 13-1 at 385. Dr. Olson noted that Jeansonne's oncologist said the side effects will improve when treatment is finished. ECF No. 13-1 at 385.

Also in February 2016, Jeansonne underwent a psychological evaluation by Dr. Rick Adams, a psychologist, at the request of Social Security Disability Determinations. ECF 13-1 at 389. Jeansonne reported taking Xanax for sleep. ECF 13-1 at 389. Jeansonne said Zoloft had been mentioned as a possible antidepressant but had not been prescribed. ECF 13-1 at 389. Jeansonne had side effects from her cancer medication but had attempted to work. ECF S13-1 at 389. The company trained her but fired her, probably due to her performance (she had to get up and walk around). ECF 13-1 at 389. The loss of her job significantly impacted her sense of self-worth and was the beginning of her problems with coping. ECF 13-1 at 390. Jeansonne used to be a "people person," but had become irritable and did not care about visiting. ECF No. 13-1 at 390. The last two years had been "rough" with her family due to her increased mood swings. ECF 13-1 at 390. Jeansonne reported that

4

she drives, shops, and does housework and cooking. ECF No. 13-1 at 390. Jeansonne does not use illegal drugs and, since her cancer diagnosis, she does not drink alcohol. ECF No 13-3 at 390. She reported problems with memory, but did not have difficulty following instructions. ECF No. 13-1 at 391. Dr. Adams found Jeansonne had a history of adjustment difficulties associated with her cancer and cancer treatment, was mildly depressed with a diminished sense of self-worth because she was not working, and was mildly irritable. ECF No. 13-1 at 391. Dr. Adams concluded: Jeansonne: has mild limitations socially (due to some irritability); has mild to moderate limitations with concentration, persistence, or pace; has some difficulty with more complex mental activity; has had no episodes of decompensation; can understand, remember, and follow simple and familiar detailed instructions; is capable of understanding more complex instructions but may have moderate difficulty in that area; and is capable of interacting and relating to supervisors, coworkers, and the general public, although tolerance in that area may be somewhat limited on a sustained basis. ECF No. 13-1 at 391. Dr. Adams diagnosed adjustment disorder with mixed anxiety and depressed mood, and found she is capable of managing funds. ECF No. 13-1 at 391.

In March 2016, a physical residual functional capacity form was completed for Jeansonne by Dr. William Bell. ECF No. 13-1 at 78. Based on his review of Jeansonne's medical records, Dr. Bell found Jeansonne can: occasionally lift/carry up to 20 pounds; frequently lift/carry up to 10 pounds; stand/walk a total of six hours in an eight-hour day; push/pull without limitation; only occasionally climb ramps,

stairs, ladders, ropes, or scaffolds; only occasionally kneel, crouch, or crawl; and frequently balance or stoop. ECF NO. 13-1 at 78-80.

Also in March 2016, Dr. Carolyn Goodrich, Ph.D., completed a mental residual functional capacity assessment for Jeansonne. ECF No. 13-1 at 80. Based on her review of Jeansonne's medical records, Dr. Goodrich found Jeansonne has: a moderate limitation in her ability to understand and remember detailed instructions (due to interference by emotional symptoms); a moderate limitation in her ability to carry out detailed instructions (due to mood issues causing difficulties with tasks involving sustained focus and complex mental demands); a moderate limitation in her ability to ask simple questions or request assistance; and limited tolerance for frequent, recurrent contact with the general public. ECF No. 13-1 at 800-82. Dr. Goodrich further explained that Jeansonne is cognitively and emotionally able to persist at tasks for six to eight hours in an eight-hour period at an appropriate pace, and can sustain that level across days and weeks; and is mentally capable of understanding and carrying out instructions and assignments, in a structured setting, in an appropriate time frame. ECF No. 13-1 at 81. Dr. Goodrich also stated that Jeansonne can accept directions and feedback from supervisors and peers; can work with coworkers and supervisors on a superficial basis without being overly distracted by psychological symptoms; would function best at tasks with minimal social demands; and can adapt to a work situation. ECF No. 13-1 at 82.

In November and December 2016, Dr. William F. Kortum (a pain management doctor) evaluated Jeansonne for chronic pain from her bilateral mastectomy and

prescribed Norco and Ultram. ECF No. 13-1 at 417, 493-94. In January through May 2017, Jeansonne was stable on that medication, so Norco and Ultram were continued. ECF No. 13-1 at 415, 488-92.

### B. Administrative Hearing

At the May 2017 administrative hearing, Jeansonne testified that she lives with her husband. ECF No. 13-1 at 38. Jeansonne last worked in February 2015 because she was terminated. ECF No. 13-1 at 38. Jeansonne received unemployment benefits for about six months. ECF No. 13-1 at 38. Jeansonne applied for several jobs, but was not interviewed. ECF No. 13-1 at 38.

Jeansonne testified that she cannot work because of her hips, knees, ankles, right shoulder, and shooting pain down her right arm. ECF No. 13-1 at 38. Standing, writing, typing, and anything like that are very difficult for more than five or ten minutes. ECF No. 13-1 at 39. Jeansonne testified that she was taking Hydrocodone and Tramadol for pain, but they did not alleviate her pain completely. ECF No. 13-1 at 39. Jeansonne does not drive when she takes pain medication because they make her feel woozy. ECF No. 13-1 at 39.

Jeansonne has anxiety and depression because it has been difficult to stay home after being active. ECF No .13-1 at 40. Jeansonne's oncologist, Dr. Baucom, prescribed Effexor initially, but it "knocked her out." ECF No. 13-1 at 40. Dr. Baucom then recommended meditation. ECF No. 13-1 at 40.

During the day, Jeansonne watches a lot of TV, reads, and does laundry. ECF No. 13-1 at 41. She watches a movie two or three times because she misses things,

and she does not pay much attention to TV shows. ECF No. 13-1 at 42. Jeansonne can drive nearby when she does not take hydrocodone, although she sometimes gets a shooting pain down her hand. ECF No. 13-1 at 41. Jeansonne goes to Walmart and the Post Office. ECF NO. 13-1 at 41. Jeansonne's husband or son go grocery shopping with her and help her pick up things. ECF No. 13-1 at 41.

Jeansonne is not able to sweep or mop, so her son and granddaughter help her with that.. ECF No. 13-1 at 41. Jeansonne is able to shower and dress herself. ECF No. 13-1 at 41-42. However, Jeansonne wears clothes with elastic because she had difficulty with zippers, buttons, and snaps. ECF No. 13-1 at 51. Jeansonne interacts mostly with family and friends. ECF No. 13-1 at 42. She has a short temper. ECF No. 13-1 at 42. Jeansonne is able to walk to the end of her driveway and back, or walk around Walmart leaning on her buggy. ECF No. 13-1 at 46.

Jeansonne is cancer-free, but her pain is a side effect of her Arimidex medication. ECF No. 13-1 at 43. Arimidex reduces the chance of her cancer recurring from 95% to 9%. ECF No. 13-1 at 44. Jeansonne is supposed to take Arimidex for five years; she started taking it in 2015. ECF No. 13-1 at 51-52.

Jeansonne has constant pain and discomfort, mostly in her right arm and left leg. ECF No. 13-1 at 44. The pain medication does not fully relieve her pain, but laying down two or three times a day for 20 to 30 minutes helps a lot. ECF No. 13-1 at 45. Jeansonne's pain is worse when she stands up for any period of time, such as to clean dishes. ECF No. 13-1 at 45. The pain starts in her hip and runs down her leg to her heel. ECF No. 13-1 at 53. She lies down to relieve the pain in her hip. ECF

8

No. 13-1 at 53. Jeansonne lies down for a total of three to four hours per day. ECF No. 13-1 at 53.

Jeansonne has not been referred to physical therapy or prescribed injections, but a heating pad helps. ECF No. 13-1 at 45. Jeansonne has been told to use an ice pack for swelling in her joints, but ice makes the pain worse. ECF No. 13-1 at 46. Jeansonne can stand for 30 minutes and sit for an hour. ECF No. 13-1 at 47. Jeansonne can lift a half gallon of milk. ECF No. 13-1 at 48. Jeansonne's doctor has told her not to lift more than 15 pounds with her right hand. ECF No. 13-1 at 48.

Jeansonne said her medical condition is worsening as she continues to take the Arimidex. ECF No. 13-1 at 48. She has developed pain in her hips and shoulders. ECF NO. 13-1 at 48-49. Jeansonne has trouble handling things like a coffee cup. ECF No. 13-1 at 49. She is able to use a cell phone and text messages. ECF No. 13-1 at 49. She has two new grandchildren who were born in 2016, but she cannot be around them (unless she wears a mask) because her immune system is suppressed. ECF No. 13-1 at 50. Jeansonne also has to wear a mask when she goes to the hospital. ECF No. 13-1 at 50.

Jeansonne has difficulty generally with focusing or concentrating on things. ECF No. 13-1 at 52. Jeansonne's anxiety causes her to feel overwhelmed. ECF No. 13-1 at 52. Also, the pain distracts her, then she becomes very aggravated. ECF No. 13-1 at 52. Jeansonne has difficulty sleeping at night because of both pain and anxiety, so she takes melatonin. ECF No. 13-1 at 52.

Jeansonne completed the tenth grade, and later attended the Delta Business College for about 18 months before it closed down. ECF No. 13-1 at 54. Jeansonne last worked at Progressive Tractor and Implement (about June 2012 through February 2015), initially as an office clerk (for about six months), then later as a certified warranty clerk. ECF No. 13-1 at 55. As an office clerk, Jeansonne took care of the shop employees' timecards and payroll. ECF No. 13-1 at 55. She stood about half the day and sat about half the day. ECF No. 13-1 at 55-56. As a warranty clerk, Jeansonne worked with the mechanics, shop employees, and technicians, filing warranties and shipping parts back. ECF No. 13-1 at 56. She was on her feet most of the day and lifted up to 50 pounds. ECF No. 13-1 at 58. After her surgery, Jeansonne could no longer lift the heavier parts unassisted, although most things weighed less than 50 pounds and she did not have to ship parts every day. ECF No. 13-1 at 56.

Jeansonne also worked at a mental health facility where she billed patients, took care of accounts payable and accounts receivable, and handled patients' money. ECF No. 13-1 at 57. In that job, Jeansonne sat half the time and did not have to lift anything. ECF No. 13-1 at 57. Before that, Jeansonne worked at a hardware store as a cashier clerk. ECF No. 13-1 at 57. Jeansonne worked on a cash register and a computer, and waited on customers. ECF No. 13-1 at 58.

The VE testified that Jeansonne's past work as: a routine office clerk (DOT 209.662-010) was semi-skilled (SVP 3) and light; a patient representative (DOT 219-362-010) was semi-skilled (SVP 4) and light; a parts clerk (DOT 222.367-042) was

10

semi-skilled and heavy; and a salesclerk (DOT 279.357-054) was semi-skilled (SVP 3) and light, but heavy as actually performed. ECF No. 13-1 at 59-60. The VE further testified that Jeansonne has transferrable work skills. ECF No. 13-1 at 61. The VE testified there is sedentary or light work the claimant can do using those skills, such as: calculator operator (DOT 216-482-022, semi-skilled, SVP 3, sedentary, 23,000 jobs existing nationally); tax preparer (DOT 219.362-070, semi-skilled, SVP 4, sedentary, 30,000 jobs existing nationally); and insurance clerk (DOT 219.387-014, semi-skilled, SVP 4, sedentary, 29,757 jobs existing nationally). ECF No. 13-1 at 61-62. The work skills transferred to those jobs are from Jeansonne's work as a patient representative. ECF No. 13-1 at 66.

The ALJ posed a hypothetical involving an individual of Jeansonne's age, education, and work experience, who can: perform light work; frequently balance and stoop; occasionally climb ramps, stairs, ladders, and scaffolds; occasionally kneel, crouch, and crawl; occasionally interact with the general public; and can perform simple, routine, and repetitive tasks but not at a production rate pace. ECF No. 13-1 at 62. Such an individual would not be able to do Jeansonne's past relevant work because they are all semi-skilled jobs. However, such a person could work as a: price marker (DOT 209.587-034, unskilled, SVP 2, light, 273,000 jobs existing nationally); housekeeper (DOT 323.687-014, unskilled, SVP 2, light, 137,000 jobs existing nationally; or linen grader[1] (DOT 361.687-022, unskilled, SVP 2, light, 3600 jobs existing nationally). ECF No. 13-1 at 63.

---

[1] The SSA's transcript incorrectly refers to this job as "lemon grater." However, DOT 361.687-022 is "Linen Grader: Grades laundered towels and similar linens according to quality,

The ALJ posed a second hypothetical involving a person who can: do sedentary work; occasionally kneel, stoop, crouch, and crawl; can occasionally reach overhead on the right; and occasionally be exposed to extreme and extreme cold. ECF No. 13-1 at 64. The ALJ testified that such a person could not work as a calculator operator, tax preparer, or insurance clerk, because they all involve frequent overhead reach. ECF No. 13-1 at 64. However, if the individual did not have the limitation of only occasionally reaching overhead, those jobs would be available. ECF No. 13-1 at 64.

The ALJ posed a third hypothetical involved an individual with the same limitations (without an overhead reaching limitation) as the second hypothetical but would, additionally, be off-task 10% of the workday. ECF No. 13-1 at 64. The ALJ testified there would not be any work that such a person could do. ECF No. 13-1 at 64-65.

Jeansonne's attorney posed a hypothetical involving the ALJ's third hypothetical but with the added mental limitation of only simple, routine, repetitive tasks. ECF No. 13-1 at 64. The ALJ testified such a person would not be able to perform Jeansonne's past relevant work. The addition of the limitation of being able to only occasionally handle, reach, and finger bilaterally would preclude the person from doing all of the jobs listed by the ALJ. ECF No. 13-1 at 66. If the individual was consistently absent four of more times per month, there would not be any jobs she could do. ECF No. 13-1 at 67.

---

condition, and kind of item. Ties them into bundles of specified size or number of articles and records contents of each bundle. Stores bundles in bins for delivery to customers of linen-rental service."

C. **ALJ's Findings and Conclusions**

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Jeansonne: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Jeansonne has not engaged in substantial gainful activity since February 15, 2015, and that she has severe impairments of state II breast cancer with post bilateral mastectomy surgery, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. ECF No. 13-1 at 20, 23. The ALJ also

13

found that Jeansonne is unable to perform any of her past relevant work. ECF No. 13-1 at 26.

The ALJ noted that Jeansonne is of advanced age, has a limited education, and has transferrable work skills. ECF No. 13-1 at 27. At Step No. 5 of the sequential process, the ALJ found that Jeansonne has the residual functional capacity to perform the sedentary work except that she is limited to only occasionally kneeling, stooping, crouching, and crawling. ECF No. 13-1 at 23. The ALJ concluded there are a significant number of jobs in the national economy that Jeansonne can perform, such as calculator operator, tax preparer, and insurance clerk and, therefore, Jeansonne was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on July 21, 2017. ECF No. 13-1 at 27-28.

## II. Law and Analysis

### A. Scope of Review.

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. *See McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. *See Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision,

but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

### B. Substantial evidence supports the ALJ's/Commissioner's finding that Jeansonne can work.

Jeansonne contends the ALJ erred in finding her mental impairments are non-severe and cause no mental limitations in her ability to work. Although the ALJ erred in finding Jeansonne's mental impairments are not severe, substantial evidence supports her conclusion that Jeansonne is not disabled.

Jeansonne's burden was to prove that she was disabled within the meaning of the Social Security Act. That requirement means that he must show a "medically

15

determinable" impairment and that he is unable "to engage in substantial gainful activity". *See Greenspan v. Shalala*, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A).

Dr. Adams diagnosed Jeansonne with an adjustment disorder with mixed anxiety and depressed mood secondary to adjustment difficulties associated with cancer and treatments. ECF No. 13-1 at 22. Dr. Adams found Jeansonne has mild social limitations, mild to moderate limitations with regard to concentration, persistence or pace, and may have some difficulty with complex mental activity. ECF No. 13-1 at 391. The ALJ gave only "some weight" to Dr. Adams's report because Jeansonne has not undergone treatment for "her alleged mental impairments and the record supports a finding of only mild limitations resulting from the claimant's mental condition." ECF No. 13-1 at 22.

Dr. Olson found Jeansonne has anxiety. ECF No. 13-1 at 378. The ALJ gave Dr. Olson's opinion little weight because she is not a mental health care professional. ECF No. 13-1 at 22.

The ALJ noted that Dr. Goodrich found Jeansonne's depression and anxiety was severe, creating mild to moderate difficulties, but gave her opinion little weight because there had not been any diagnosis of a mental impairment by a treating source. ECF No. 13-1 at 22.

Dr. Adams and Dr. Goodrich agreed that Jeansonne has anxiety and depression. The fact that Jeansonne is not receiving treatment for her mental

problems does not mean they do not exist and the ALJ erred in so finding. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2002) (ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments). The ALJ is not a doctor, and it was inappropriate for her to substitute her lay-opinion for that of two psychologists.

However, neither Dr. Adams or Dr. Goodrich found Jeansonne's depression and anxiety prevent her from working. The ALJ's first hypothetical included a limitation of only simple, routine, repetitive tasks, as recommended by the psychologists. Under that hypothetical, Jeansonne could work as a price marker, housekeeper, or linen grader.

Therefore, although substantial evidence does not support the ALJ's/Commissioner's finding that Jeansonne does not have any mental limitations and can work as a calculator operator, tax preparer, or insurance clerk, a remand is unnecessary. *Compare Comeaux v. Astrue*, 2007 WL 4759401, at *3 (W.D. La. 2007) (report and recommendation), *adopted*, 2:06-1635, Doc. 13 (W.D. La. 2008); *see also* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). There is substantial evidence in the record to show there is work existing in significant numbers in the national economy (price marker, housekeeper, linen grader) that Jeansonne can do despite her depression and anxiety.

### III. Conclusion

Because there is substantial evidence to support a finding that Jeansonne can work despite her mental and physical limitations, the final decision of the Commissioner is AFFIRMED and Jeansonne's appeal is DENIED AND DISMISSED WITH PREJUDICE.

THUS ORDERED AND SIGNED in Chambers at Alexandria, Louisiana on this  27th  day of April 2020.

_____
Joseph H.L. Perez-Montes
United States Magistrate Judge